**FILED**

DEC 1 1 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VANESSA STENZ, as special
Administrator for the Estate
of WALTER J. STENZ, individually,

        Plaintiff,                No. Civ. S-02-958-DFL

    v.                            FINDINGS OF FACT AND
                                     CONCLUSIONS OF LAW

CALFARM INSURANCE COMPANY

        Defendant.
_____/

    This is an ERISA case that was tried to the court beginning October 7, 2003 and ending the following day. The court has jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. This Memorandum of Opinion constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52. For the reasons stated below, the court finds that defendant CalFarm has not met its burden of demonstrating that rescission of the insurance contract is justified.

    There is one major area of factual dispute and one central legal dispute. The factual dispute concerns what Dr. Tang told

1

Walter Stenz about his physical condition in the course of a physical in December, 1997. Dr. Tang has no current recollection of what he said at the physical; however, Mrs. Stenz does. She was present throughout the physical, and therefore, the court must resolve the credibility of her testimony in light of Dr. Tang's medical records. The legal issue concerns precisely what standard applies to objectively incorrect statements on an insurance application. CalFarm is of the view that it must only show that the statement was incorrect, that the applicant was told the correct information at any point prior to the completion of the application, and that the incorrect statement was material to its insurance decision. Under this view of the law, it is irrelevant whether the applicant understood or remembered the correct information. Plaintiff takes the view that rescission is only permissible where there has been an intentional, false statement – a showing of fraud. Under this view, it makes all the difference whether the applicant "believed" the incorrect information to be true, even if the applicant's belief was not objectively reasonable. The court concludes that the standard is somewhat different than either party contends.

I.

In the spring of 2000, Walter J. Stenz ("Stenz") took a full time job as a carpenter with Novick Construction, located in Truckee, California. Novick agreed to pay for health insurance for Stenz from CalFarm. Prior to accepting employment with

1  Novick, Stenz had health insurance through the Biltmore Hotel in
2  Crystal Bay, Nevada, where he worked in the casino as a dealer.
3  Stenz continued to have health insurance through the Biltmore
4  until CalFarm covered him. Nothing in the record suggests that
5  Stenz was dissatisfied with the health insurance provided by the
6  Biltmore or that this health insurance would not cover him for
7  the medical expenses he incurred after June 15, 2000.
8      On May 9, 2000, Stenz signed a CalFarm health insurance
9  application. The application was mostly filled out by a CalFarm
10 agent, Kent Lewis ("Lewis"). Except for the check-marks on page
11 3 for questions 1 through 10 and Stenz's signature, all other
12 writings on the application are in Lewis' handwriting. Mrs.
13 Stenz was present when her husband and Lewis met to fill out the
14 application.
15     The application is the central exhibit in the case. See Ex.
16 1. Page 3 of the application is the "Medical Information"
17 portion of the application. This section of the application asks
18 the applicant to check "yes" or "no" to a series of ten health
19 questions. The introduction to the questions states: "Answer
20 questions to the best of your knowledge and belief for all
21 Applicants and provide details in space provided for all
22 questions answered 'Yes'." The signature page of the application
23 also repeats the "information and belief" standard: "All answers
24 in this application are true and correctly recorded to the best
25 of my knowledge and belief." According to the uncontested
26

1  testimony of Lewis, an applicant is not expected to refresh
2  recollection by consulting with former doctors or requesting
3  medical records. As Lewis put it, the "information and belief"
4  language asks the applicant "to do the best that you can as you
5  sit here today."
6  The first of the ten questions includes multiple parts as
7  follows:

>  1. Has ANY applicant within the past 5 years, received professional advice, treatment or diagnosis for:
>  a. Heart attack, stroke, irregular heart beats, chest pain or had heart surgery?
>  b. High blood pressure or any disease of the blood or blood vessels?
>  c. Epilepsy, convulsions, depression, panic attacks, anxiety or any neurological disease?
>  d. Asthma, allergies, emphysema, sleep apnea or any disease of the lungs or respiratory system?
>  e. Ulcer colitis, or any disease of the stomach, intestines, rectum, gallbladder, spleen, liver pancreas, or hernia?
>  f. Diabetes, sugar or albumin in the urine?
>  g. Kidney stones, kidney disease, bladder, prostate or urinary system disease?
>  h. Cancer or any tumor, growth, or skin disease?
>  I. Breast disease or surgery including breast implants, uterine disease, or any disease of the reproductive organs?
>  j. Thyroid or other glandular disease or any disease of the eyes, ears, nose or throat?
>  k. Arthritis, lupus, gout, rheumatism, back pains, or any disease of the bones, joints, spine or muscles?
>  l. Acquired Immune Deficiency Syndrome (AIDS) or the AIDS -related complex (ARC)?
>  m. Any sexually transmitted disease (not including HIV)?
>  n. Complications of pregnancy or a cesarian section?
>  o. Infertility (male or female) or male impotence?
>  p. Any physical abnormality, deformity or disfigurement?

23  Stenz answered "no" to all of these questions, with the
24  exception of h relating to cancer. The bottom of the form
25  contains a space for additional medical information concerning
26

4

any question that is answered "yes." Lewis filled in an explanation for 1h. The explanation states that Stenz had "pre skin cancer" in 1996 and was now "100% normal." The name of the treating doctor is listed. Although the testimony is in conflict, and the point is not necessary to the court's ultimate conclusion, the court finds that while Stenz undoubtedly told Lewis that his skin condition was now "normal," or "cured," it is more likely than not that Lewis came up with the phrase "100% normal."

In evaluating Stenz's answers to question number 1, it is important to keep in mind the focus of the questions; they do not ask whether the applicant has a condition but only whether the applicant in the last 5 years has "received professional advice, treatment or diagnosis for" the particular condition. Thus, an applicant could suffer from a condition such as arthritis, for example, but properly answer "no" if the applicant had not received professional advice for the condition.

Question number 2 addresses drug and alcohol use. Conspicuously absent are any subparts directed to tobacco use. Stenz was a heavy smoker; yet none of the questions asked for this information. Stenz answered all of these questions in the negative.

Question number 3 asks: "Has any Applicant had an exam, consultation, checkup, been hospitalized or been treated by a doctor, acupuncturist, chiropractor, psychiatrist, or

psychologist for any reason within the past 5 years?" Stenz answered "yes" to this question. The explanation at the bottom of the form, filled in by Lewis, states that Stenz had a complete physical exam in the Fall of 1997 and that the physical was "100% normal." The name of the attending doctor is given as Dr. Peterson. In fact, the attending doctor was Dr. Robert Tang, an internist in Dr. Peterson's office. Although CalFarm sometimes seems to suggest that this mistake was intended to mislead, there is no support for such an inference. Had the insurance company sought to speak to Dr. Tang or look at Stenz's medical records, it would have necessarily contacted Dr. Peterson's office.

As to the "100% normal" statement, the court again finds that the particular language was in Lewis' handwriting and was Lewis' turn of phrase. However, the court also finds that in this instance, as with question 1h, Stenz told Lewis that his results were normal.

Question number 4 asks:

Has any Applicant, within the past 5 years:
a. Had an abnormal laboratory test (not including HIV blood tests or studies), EKG or x-ray?
b. Been advised to have diagnostic tests (not including HIV blood test or studies), treatment, surgery, or hospitalization?"

Stenz answered "no" to both parts of this question.

This is another focal point in the case because the defendant insists that Stenz should have answered "yes" to both parts of the question because, some 2½ years earlier, he had an abnormal blood test as part of the 1997 physical and, during the

same examination, was told by Dr. Tang to have a chest x-ray. According to CalFarm, the term "diagnostic tests" clearly includes x-rays, even though x-rays are separately listed in part a.

The remainder of the questions do not appear to be at issue, and all were answered in the negative.

The application was signed by Stenz, under a certification stating:

> I understand that all answers in this application will be relied on by CalFarm in its approval or declination of my application. If any answers are misstated, incorrectly recorded, or are not true, the insurances is subject to rescission, in which case the insurance is deemed to be void from the effective date.

On receiving the application, CalFarm underwriter Barbara Ramey determined that she did not need to do further investigation and did not need to obtain Stenz's medical records because he presented an acceptable risk to CalFarm. Accordingly, CalFarm approved the application on June 15, 2000, and issued a certificate of insurance effective June 1, 2000.

The certificate includes a statement indicating that the company has relied on the information in the application and that if that information "was misstated, incorrectly recorded, or is not true," the company may rescind the certificate. There is a further "Rescission" provision that permits rescission if the insured

> (a) misrepresents a material fact in, or omits a material fact from the application for insurance under this Certificate . . . and (b) had the material fact not been

7

misrepresented or omitted, coverage under this Certificate would not have been issued as applied for; and c) the misrepresentation or omission is not discovered until after coverage is in force.

In November 2000, Stenz was first diagnosed with lung cancer. On April 3, 2001 CalFarm rescinded the insurance. Stenz died on April 23, 2001.

Because CalFarm bases its rescission decision on Stenz's failure to disclose the results of a physical by Dr. Tang on December 16, 1997, the focus of the trial was on Dr. Tang's medical records and Mrs. Stenz's recollection of the physical and Dr. Tang's statements to her husband. Dr. Tang has no current recollection of what he said to Stenz. There is a sharp conflict between the medical records and what Mrs. Stenz recalls of the physical: the medical records reveal various potentially serious problems, yet Mrs. Stenz recalls that Dr. Tang at no time warned her husband of any of these problems and never used such worrisome terms as "emphysema."

There is no doubt that had CalFarm examined Dr. Tang's notes of that physical, it would never have issued the insurance. The notes mention the following information, some of which would have raised a red flag under CalFarm's underwriting guidelines: Stenz has had occasional, intense chest pain, "drinks relatively heavy," has "a thirty-pack year history plus of smoking," has "a chronic cough," his "family history is notable for lung cancer," has high blood pressure, "his skin is notable for some spiders"

indicating liver disease, has "peripheral clubbing" of fingers indicative of cancer or inflammation, his lungs are "notable for slight wheezes," and has a slightly enlarged prostate. In the "overall impression" section, Dr. Tang notes: "47-year old man here to establish care seeking to quit tobacco. He also has findings consistent with some COPD[1] and he also has clubbing, which I discussed with him." In the issues section, Dr. Tang lists five points. First, on smoking, Dr. Tang states that he advised Stenz to quit and started him on nicotine patches. Second, as to the "clubbing," Dr. Tang states that he recommended a chest x-ray and other evaluations "for things such as CA, including a colonoscopy, and we brought this up." Dr. Tang states that Stenz "refused a chest x-ray as he is about to go on vacation. His reasoning is that he would not want any bad news before his vacation." Third, as to fatigue, Dr. Tang indicates that he will order a blood test for anemia and cholesterol. Fourth, as to the prostate, Dr. Tang states that he will "check a PSA." Finally, as to Stenz's cough, Dr. Tang notes that a chest x-ray will suffice and further notes, "[h]e does have some COPD . . . his chest pain is atypical, but functionally this gentleman does have his risk factors. For that reason, an ECG with treadmill would not be unreasonable." The notes conclude that Stenz is to follow up with Dr. Tang in a week to ten days.

Dr. Tang took blood from Stenz for testing at the time of

---

[1] COPD is an abbreviation for Chronic Obstructive Pulmonary Disease, more commonly known as emphysema.

the physical.  In mid-January, 1998, having returned from a two week vacation, Stenz called Dr. Tang to get the results of the blood tests. They had a brief conversation.  Dr. Tang followed up by sending Stenz a letter on January 14, 1998 that included the laboratory report on the blood tests.  The letter stated:

> You do have some elevation in your liver function tests, which can be a combination of things - a normal variant, this may be secondary to drink, or you may have some element of hepatitis as well.  Your cholesterol is slightly elevated, but your overall values puts you at a slightly higher cardiovascular risk as you can see from the numbers.  In addition to this, your hematocrit is slightly elevated which suggests a combination of things - smoking can do this and also the higher elevation can do this.
>
> If you have any further questions, please do not hesitate to come in.

This was the last contact between Dr. Tang and Stenz.

Mrs. Stenz's testimony conveys a rather different impression of the physical.  To begin with -- and this point is not disputed -- the purpose of the physical was Stenz's desire to get help in stopping smoking.  He did not appear at the physical because he was bothered by any particular condition other than a smoker's cough and, according to Mrs. Stenz, the focus of the physical was on the issue of how to help Stenz stop smoking.  Further, according to Mrs. Stenz, the most alarming information in Dr. Tang's notes was either not conveyed or not conveyed in a way that suggested that the information was significant.  The medical notes were never provided to Stenz prior to June 2000 when the insurance was issued.  According to Mrs. Stenz, Dr. Tang never used the word "COPD" or "emphysema," did not explain the

significance of "clubbing," did not point out any skin "spiders," and did not indicate that the blood test was abnormal or required any follow up investigation. As to the chest x-ray, Mrs. Stenz testified that her husband was not resistant to care and that he simply preferred to get the x-ray after their two-week trip. Mrs. Stenz testified that she and her husband understood that the x-ray was no longer necessary after speaking to Dr. Tang in mid January and receiving the report of the blood tests. They drew this conclusion from Dr. Tang's silence on the matter and what they took to be a normal blood test. Ironically, had Stenz been x-rayed the x-ray would have been normal.[2]

## II.

CalFarm has the burden of showing that medical information was given to Stenz by Dr. Tang and in such a way that Stenz can be held responsible for any answers on the application inconsistent with what he was told by Dr. Tang several years earlier.

CalFarm has the burden of proof on a rescission. See Meyling v. Security Life Ins. Co., 146 F.3d 1184, 1192 (9th Cir. 1998)("[b]ecause the premium collected was unaffected by the misstatements, [the insurer] cannot establish materiality and is not entitled to common law rescission."). Federal common law applies in ERISA actions and looks to general common law principles on rescission that place the burden of proof on the

---

[2] When the symptoms of lung cancer began to appear in July 2000, Stenz had a chest x-ray which was negative.

party seeking rescission. See Hager v. Thomson, 66 U.S. 80, 91 (1850) (decided under federal common law); Royal Indem. Co. v. Kaiser Aluminum & Chemical Corp., 516 F.2d 1067, 1070 (9th Cir. 1975) (California law). CalFarm concedes that it bears the burden of showing that its rescission decision was correct. In addition, CalFarm does not assert that its decision is subject to review for abuse of discretion. Accordingly, the court reviews CalFarm's recission decision de novo.

Less clear is exactly what CalFarm must show concerning Stenz's state of mind or knowledge when he filled out the application. CalFarm did not contend at trial and did not prove that Stenz had a fraudulent intent. Stenz already had health insurance when he applied to CalFarm and there was no showing that he purposefully tried to deceive CalFarm. In the most recent review of this precise question, also in the context of ERISA and a health insurance application that included a "knowledge and belief" attestation, the Eighth Circuit held that "a misrepresentation as to a material matter made knowingly in an application for an ERISA governed insurance policy is sufficient to rescind the policy." Shipley v. Arkansas Blue Cross and Blue Shield, 333 F.3d 898, 903 (8th Cir. 2003). In further explanation of the term "knowingly," the court held even if the applicant actually believed that the answers were correct, the applicant would be found to have acted knowingly where he "was not justified in believing his answers to be

true." Id. at 905. The court cited with approval the following language from Skinner v. Aetna Life and Cas., 804 F.2d 148, 151 (D.C. Cir. 1986):

> The twin qualifiers [knowledge and belief] require[] that knowledge not defy belief . . . What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but *only* so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In such event, a court may properly find a statement false as a matter of law, however sincerely it may be believed.

Under this standard, CalFarm has the burden of showing that Stenz was not justified in believing his answers to be true in the sense that his belief was "clearly contradicted" by factual knowledge of which he was aware. The "of which he was aware" and "not justified" formulations, moreover, require that the information be such that a reasonable person would remember it and appreciate its relevance to the questions asked on the application. Otherwise the "knowledge and belief" attestation -- with the clear implication that no research or refreshment of recollection is expected -- would be a trap for the unwary. All told, this is a significant burden for the insurance company, as one would expect on a rescission decision. As applied here, because the testimony of Mrs. Stenz is credible and creates at least uncertainty as to what information Dr. Tang gave to Stenz, the court finds that CalFarm has not met its burden of proof.

III.

CalFarm contends that Stenz should have checked "yes" to question 1a because of chest pain. But the lead in to the question – "Has ANY applicant within the past 5 years, received professional advice, treatment or diagnosis for . . . chest pain" – would seem to exempt Stenz's chest pain because he did not seek out Dr. Tang because of chest pain and did not receive "professional advice, treatment or diagnosis" for the chest pain. Indeed, the only note in the medical records concerning chest pain is the comment that the chest pain is atypical. It does not appear that Dr. Tang gave Stenz any diagnosis, advice, or treatment specifically tied to chest pain.

CalFarm contends that Stenz should have answered "yes" to question 1b – high blood pressure – because his blood pressure was elevated. This argument is without any merit. The medical records do not suggest that Dr. Tang thought that Stenz's blood pressure was elevated or that Dr. Tang made any comment to Stenz relating to his blood pressure let alone "advice, treatment or diagnosis." It is distinctly possible that the medical records are not accurate as to blood pressure, but even if accurate, the application does not require an applicant to make an independent assessment of his own blood pressure.

CalFarm contends that Stenz should have answered "yes" to question 1d, relating to asthma, allergies, emphysema, sleep apnea or any disease of the lungs or respiratory system, because

he had emphysema. Although Stenz did complain to Dr. Tang of a smoker's cough, Dr. Tang never told him that he had COPD or emphysema or any "disease" of the respiratory system. Stenz did not know this information when he filled out the application.

CalFarm contends that Stenz should have answered "yes" to question 1g because he had an enlarged prostate. The question asks whether the applicant has received "advice, treatment, or diagnosis" for "kidney stones, kidney disease, bladder, prostate or urinary system disease." The question is reasonably understood as directed to prostate "disease." There is no evidence that Dr. Tang considered that Stenz's enlarged prostate amounted to prostate "disease." Nor is there any evidence that Dr. Tang discussed the matter with Stenz or told Stenz that there was an issue with respect to his prostate. The January 1998 report on the blood test makes no mention of the prostate.

CalFarm contends that Stenz should have answered "yes" to question 1p relating to "[a]ny physical abnormality, deformity or disfigurement" because he had clubbing of the fingers and "spiders." However, according to Mrs. Stenz, while Dr. Tang made mention of "clubbing," he did not explain the possible significance of the finding and made no mention of skin spiders. Moreover, the question does not ask whether the applicant has ever been told he has "clubbing." Instead, it is phrased in terms of "physical abnormality, deformity or disfigurement." It is not obvious, and there is insufficient evidence, that

whatever swelling of the fingertips or small skin blemishes that Stenz had would fit within the characterization of a "physical abnormality, deformity or disfigurement." The question calls for characterization and interpretation and not a straightforward statement of fact. CalFarm has not shown that Stenz was unjustified in answering "no" to this question.

CalFarm contends that Stenz should have answered "yes" to questions 4a and 4b which ask:

> Has any Applicant, within the past 5 years:
> a. Had an abnormal laboratory test (not including HIV blood tests or studies), EKG or x-ray?
> b. Been advised to have diagnostic tests (not including HIV blood test or studies), treatment, surgery, or hospitalization?

According to CalFarm, Stenz should have answered "yes" to 4a because his liver function test was elevated. But again the question calls for interpretation. Given the January 1998 report from Dr. Tang, Stenz was justified in concluding that his liver function tests were not "abnormal." In fact, Dr. Tang gave his opinion that whatever elevation was present could be a "normal variant."

As to 4b, CalFarm contends that Stenz was told to have a whole battery of tests by Dr. Tang, including a chest x-ray, colonoscopy, PSA test, liver function test, and an ECG with treadmill. However, the medical records do not suggest, and Mrs. Stenz does not recall, that Dr. Tang ever told Stenz he needed all of these tests. The only "test" that the evidence suggests that Dr. Tang recommended was a chest x-ray. There are

16

two problems with CalFarm's position. First, it is not clear, in context, that an "x-ray" is a "diagnostic test." Part 4a treats "x-ray" as something different from "laboratory test" and breaks it out as a separate category. Part 4b specifically mentions HIV tests, suggesting that "diagnostic tests" are blood tests. No mention is made of x-rays in part 4b. A reasonable applicant could be in some uncertainty as to whether a chest x-ray was a "diagnostic test." Second, CalFarm has not shown that Stenz acted without justification in answering "no" in light of the fact that Dr. Tang made no mention of a continuing need for a chest x-ray after the blood tests were completed. Although it may not be required that a doctor reiterate the need for a further test, when one set of different tests is completed, Dr. Tang's silence and implicit suggestion that he would not be seeing Stenz unless Stenz had further questions about the blood test could have caused Stenz reasonably to conclude that the chest x-ray was no longer needed. While it is understandable that the insurance company was provoked by the note in the medical records that Stenz refused the chest x-ray because he did not want bad news, the company is drawing far too many inferences from this event. First, there is no indication that Stenz thought he had lung cancer. Second, there is no indication that Dr. Tang thought that the x-ray could not wait for two weeks. Third, there is no indication that Stenz was "in denial" concerning his medical condition. He followed up with

Dr. Tang on the blood test results and requested that Dr. Tang explain them. Finally, there should be no suggestion that if only Stenz had taken a chest x-ray the lung cancer would have been revealed, and CalFarm entitled to treat it as a pre-existing condition. When Stenz had a chest x-ray in July 2000 it was clear for cancer.

For these reasons, CalFarm has not met its burden of showing that Stenz was unjustified in answering "no" to the question relating to "diagnostic tests."

Finally, CalFarm contends that it was misleading for Stenz to state that his physical exam was "100% normal" when the medical records of the physical suggest so many possible problems. But the evidence does not show by a preponderance that Stenz was notified of these problems or told that he suffered from abnormalities or conditions that were not normal for someone of his age. Given that CalFarm's agent came up with the "100% normal" turn of phrase, it seems particularly unfair to rescind on this basis. CalFarm has not shown that Stenz was unjustified in thinking that his medical condition was "normal" in light of the information given to him by Dr. Tang.

For these reasons, the court concludes that CalFarm was not entitled to rescind the certificate of insurance.

IV.

In the pre-trial order, the parties stipulated that CalFarm would have paid $130,736.88 in medical benefits had the

18

insurance not been rescinded.  Therefore, CalFarm shall pay this amount to plaintiff, in addition to any other benefits that Stenz was entitled to, within ten days of the date of this order.

Judgment shall enter.

IT IS SO ORDERED.

Dated: 11 December 2003.

David F. Levi
United States District Judge

```
                United States District Court
                          for the
                Eastern District of California
                      December 11, 2003


              * * CERTIFICATE OF SERVICE * *


                                       2:02-cv-00958


   Stenz

       v.

   Calfarm Insurance Co

_____


I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  December 11, 2003, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


        James Ernest Simon                      HV/DFL
        Porter Simon
        589 Tahoe Keys Boulevard                VC/GGH
        Suite E-8
        South Lake Tahoe, CA  96150

        John L Viola
        Thelen Reid and Priest
        333 South Hope Street
        Suite 2900
        Los Angeles, CA  90071-3048



                                       Jack L. Wagner, Clerk

                                       BY: _____
                                              Deputy Clerk
```